# NEW ORLEANS NATIONAL BANKING ASSOCIATION *v.* LE BRETON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Argued October 21, 22, 1886. — Decided March 21, 1887.

In Louisiana a holder of a first mortgage on real estate, duly executed before a notary with *pact de non alienando*, is not bound to give notice to subsequent mortgagees, or to any person but the debtor in possession, when he proceeds by executory process to obtain seizure and sale of the mortgaged property to satisfy the mortgage debt.

In Louisiana a mortgage given to secure a future balance on an open unliquidated account is valid; and the acknowledgment of the amount of the balance by the debtor, before a notary, is all that is necessary to be done under the Code, in order to ascertain it for the purposes of executory process.

In Louisiana, informalities connected with or growing out of any public sale, made by any person authorized to sell by public auction, are prescribed against by those claiming under the sale after the lapse of five years from the time of making it, whether against minors, married women, or interdicted persons.

W, owning a plantation in Louisiana, and being embarrassed, agreed with several of his creditors and with K, that W should remain in possession and work the plantation; that K should make annual advances to a stipulated amount to enable him to work it, and should receive and dispose of the crops and apply their products, first to the payment of his own account, and next to the payment of the debts of the creditors; and that for these advances and the balance on his account K should have a first mortgage on the plantation with *pact de non alienando*, and that the debts of said creditors should be secured by a mortgage subsequent to the lien to secure K's account. A second mortgage was afterwards made to K, with a like *pact*, and with an agreement, in which all joined, that it should have priority over the first mortgage. The plantation was worked at a loss, and K having made large advances, W acknowledged the amount of them before a notary, and K proceeded by executory pro-

cess to obtain a sale of the plantation, and it was sold under judicial process. In a suit brought after the lapse of eight years by one of said creditors to foreclose the creditors' mortgage, and to set aside the sale under the mortgage to K: *Held*, (1) That no notice to the creditors of the proceedings to foreclose K's mortgage was necessary; (2) That W's acknowledgment of the balance due on K's account was all the ascertainment that was required; (3) That the relation of trustee and *cestuis que trust* did not arise between K and the creditors; (4) That the creditors were guilty of laches in allowing so long time to elapse after knowledge of the sale, before commencing proceedings to disturb it.

BILL in equity to foreclose a mortgage, and to set aside a sale under a prior mortgage. The case is stated in the opinion of the court.

*Mr. J. D. Rouse* (with whom was *Mr. William Grant* on the brief) and *Mr. John A. Campbell* for appellants.

*Mr. James McConnell* for appellees submitted on his brief.

MR. JUSTICE BRADLEY delivered the opinion of the court.

The bill in this case is brought to foreclose a certain mortgage on a plantation in Terrebonne Parish, Louisiana, called the Ardoyne plantation, with the stock thereon, and to have the same sold, and the proceeds distributed amongst the parties secured by the mortgage, and to set aside, as illegal, fraudulent, and void, a former sale made by executory process at the suit of S. H. Kennedy & Co., one of the parties secured by the same instrument.

The mortgage referred to was given by notarial act on the 12th of April, 1872, by one Nolan S. Williams, to secure various creditors large amounts respectively due to them; amongst others, to secure the complainants in the bill (the appellants here) the sum of $50,606.83, with interest at eight per cent. per annum, due to the New Orleans National Banking Association, and $6856.95, with like interest, due to McComb. The mortgage contained the *pact de non alienando*. In the same instrument it was agreed that Williams should conduct and cultivate the plantation, and should receive $2000 per year for his support out of the advances to be made as hereafter stated;

and Samuel H. Kennedy, one of the appellees, for his firm of S. H. Kennedy & Co., agreed to make all necessary advances in cash and in purchase of supplies to carry on and cultivate the plantation during the existence of the mortgage, not to exceed $30,000 per year, to be evidenced by an open account. to be kept by said firm between them and the plantation: To secure Kennedy & Co. for these advances, Williams, by the same instrument, mortgaged the plantation to said firm, with the like *pact de non alienando ;* and it was agreed by all the parties, both mortgager and mortgagees, (who all joined in the act,) that the mortgage granted in favor of Kennedy & Co. should have priority and rank of first mortgage over the one granted in favor of the other creditors. To further secure Kennedy & Co., Williams also mortgaged to them the crops of the plantation, and agreed to consign the same to them for sale in New Orleans, and Kennedy & Co. were to have the usual commissions and charges; and, after they were reimbursed for their advances, interest, and costs, the balance of the proceeds of the crops was to be applied by them, each year, to the debts due to the other mortgagees.

The accounts of Kennedy & Co. with the plantation for the year 1872, showed that the advances required for that year amounted to over $40,000, and that the net proceeds of the crop were less than that sum.

In anticipation of this state of things another instrument was executed before a notary by all the parties, on the 30th of December, 1872, by which it was agreed that Kennedy & Co. should advance $40,000 for that year, and $35,000 for each succeeding year, instead of $30,000, as provided by the first agreement; and to secure them for such advances, Williams mortgaged to them the plantation anew ; and the other creditors agreed and consented that the new mortgage should have priority and rank of first mortgage over that granted in their favor by the act of April 12, 1872.

The accounts of the next year, 1873, showed that the proceeds of the crop were insufficient to pay Kennedy & Co.'s advances by more than $28,000; and it seemed evident that the plantation could not be carried on without serious loss to all the parties concerned.

In this condition of things Kennedy & Co. justly considered themselves authorized to proceed upon their mortgage for the collection of the amount due to them. It stood at that time upon an open account; and, on the 28th of January, 1874, they procured Williams to make an acknowledgment before a notary public of the balance due, which amounted to $28,097.-36, for which he, at the same time, confessed judgment, and consented and agreed that, under said act, and the two acts of mortgages before referred to, Kennedy & Co. should have the right to seize and sell the plantation under execution process.

Thereupon, on the 31st of January, 1874, Kennedy & Co. presented a petition for executory process to the judge of the district court for the parish of Terrebonne, setting out therein the two mortgages, the fact that the plantation was incurring indebtedness every year, instead of paying anything, the amount of balance due them, and the notarial act by which Williams had admitted the amount, and confessed judgment therefor, and praying for an order of seizure and sale to be directed to the sheriff, for the purpose of satisfying their claim. Williams endorsed the petition, waiving all notices and legal delays. An order was accordingly made, and Williams having waived all formal notices, the property was advertised and sold by the sheriff on the 7th of March, 1874, and S. H. Kennedy became the purchaser for the sum of $17,435.32, the appraised value being $26,142.62.

The grounds on which the complainants seek to set this sale aside are illegality and fraud.

The illegalities alleged are, first, that the complainants and other mortgage creditors were not made parties to the proceeding and were not notified of the sale; and, secondly, that the debt, being an open account until acknowledged by Williams, was not an exigible debt under the mortgage alone, and that the seizure and sale had no validity, except in virtue of the confession of judgment made by Williams on the 31st of January, and hence could not affect the complainants who had a prior mortgage.

Neither of these objections seems to be well founded. A holder of a first mortgage, duly executed before a notary,

with *pact de non alienando,* is not bound to give notice to any person but the debtor in possession.

The Code of Practice, Art. 732, declares that : "Executory process can only be resorted to in the following cases: 1. When the creditor's right arises from an act importing a confession of judgment; and which contains a privilege or mortgage in his favor."

Art. 733 : "An act is said to import a confession of judgment in matters of privilege and mortgage, when it is passed before a notary public or other officer fulfilling the same functions, in the presence of two witnesses, and the debtor has declared or acknowledged the debt for which he gives the privilege or mortgage."

Art. 734 : "When the creditor is in possession of such an act, he may proceed against the debtor or his heirs, by causing the property subject to the privilege or mortgage to be seized and sold, on a simple petition, and without a previous citation of the debtor, in the manner laid down in the third paragraph, second section, third chapter of the first part of this Code."

Art. 735 : "In obtaining this order of seizure, it shall suffice to give three days' notice to the debtor, counting from that on which the notice is given, if he resides on the spot, adding a day for every twenty miles, between the place of his residence and the residence of the judge to whom the petition has been presented."

The Civil Code, Art. 3397 (3360), declares that "The mortgage has the following effects: 1. That the debtor cannot sell, engage or mortgage the same property to other persons, to the prejudice of the mortgage which is already made to another creditor."

These sections do not, it is true, speak of the *pact de non alienando* and its peculiar effect. This pact and its consequences were derived from the Spanish law, and were not affected by the Code, and have been firmly established in the jurisprudence of Louisiana. *Nathan* v. *Lee,* 2 Martin (N. S.) 32; *Donaldson* v. *Maurin,* 1 La. 29; and other cases cited in Hennen's Dig. Arts. Executory Process, III. (b) ; Mortgage, VI. (c), 6 ; Louque's Dig. *ib.* This rule not only applies to

subsequent purchasers from the mortgagor, but to subsequent incumbrancers. *Guesnard* v. *Soulie*, 8 La. Ann. 58. The mortgage of Kennedy & Co. contained all the requisites required for this process. It was a first mortgage by agreement of all the parties, and contained the pact in question. The fact that the complainants and other creditors had a junior mortgage by virtue of the same instrument makes no difference. They agreed to stand on the plane of second mortgagees, and must be bound by the conditions attaching to such a position. It has even been held by the Supreme Court of Louisiana that where two separate notes, drawn in favor of different individuals, were secured by the same mortgage, either mortgagee may sue to enforce his rights without a joinder of the other. *Utz* v. *Utz*, 34 La. Ann. 752. And, in another case, it was held that where there are concurrent mortgagees, one of them may proceed by executory process to foreclose the mortgage without giving special notice to the others. *Soniat* v. *Miles*, 32 La. Ann. 164. In such cases the other interested parties are entitled to their proper shares of the common proceeds. *Carite* v. *Trotot*, 105 U. S. 751, 755.

But in this case, Kennedy & Co. had not only the joint mortgage of April 12, 1872, as security for their claim, but the separate one of December 30, 1872, in which the complainants and other creditors repeated their consent that it should be a first mortgage, and have priority over theirs. We think, therefore, that there can be no doubt that Kennedy & Co. had a right to proceed by executory process without giving special notice to the other mortgagees, if they had a right to executory process at all.

The complainants, however, deny that Kennedy & Co. had any such right, because their claim stood in the form of an open, unliquidated account, and the balance had to be acknowledged by the debtor Williams before it was in a proper shape for executory proceedings. We do not think that this objection can prevail. The mortgage on its face was good for any sum not exceeding $35,000, and though this was to cover future advances, it was none the less efficacious as a mortgage to the extent of those advances, less the amount of any

credits realized from the proceeds of the crop, or otherwise. The law on the subject of such mortgages is laid down in the Civil Code as follows:

Art. 3292 (3259): "A mortgage may be given for an obligation which has not yet risen into existence; as when a man grants a mortgage by way of security for indorsement which another promises to make for him."

Art. 3293 (3260): "But the right of mortgage, in this case, shall only be realized in so far as the promise shall be carried into effect by the person making it. The fulfilment of the promise, however, shall impart to the mortgage a retrospective effect to the time of the contract."

These articles, read in connection with those previously quoted, and the express agreement of the parties, are sufficient to show that there is no foundation for the objection. As matters stood in January, 1874, all that was necessary was an ascertainment of the balance due from the plantation to Kennedy & Co.; and for this balance, to any amount less than $35,000, the mortgage was as good as if the precise sum had been named in it when it was executed. To ascertain this balance, for the purposes of executory process, all that was wanted under the Code was the acknowledgment of the debtor. Such an acknowledgment was made in solemn form before a notary, and satisfied the conditions of the law.

It is true that the other mortgagees were interested in the amount of the balance due at the end of each year, and were undoubtedly entitled to inspect the accounts which Kennedy & Co. were to keep with the plantation; but the latter were not required to render accounts to them in the ordinary sense of those terms. Their accounts were with Williams, to whom the advances were made, or with the plantation, which was the same thing; and their settlements were properly made with him; and being so made, were binding on all the parties, unless fraud or collusion could be shown. The evidence shows that Kennedy & Co. were always ready and willing to have their accounts inspected, if the other parties had desired to inspect them. This was all that the agreement implied or required. Hence the acknowledgment by Williams of the

correctness of the accounts, and of the balance due to Kennedy & Co., was a sufficient ascertainment of the amount due to them to "impart to the mortgage a retrospective effect to the time of the contract."

The fact that Williams, in addition to making an acknowledgment of the amount of the debt, also confessed judgment for it, did not deprive Kennedy & Co. of their rights under the mortgages, which themselves had the force of confessed judgments. The executory process was sued out upon them all, and had the effect due to all or any of them. The acknowledgment, it is true, was all that was needed under the law to make the mortgages exigible, and the confession of judgment was a supererogatory formality which did not affect their validity.

The complainants' case, therefore, must stand or fall upon the charge of fraud and conspiracy on the part of Kennedy & Co. and Williams. We have carefully examined the evidence in relation to this charge, and are satisfied with the conclusions reached by the Circuit Court on the subject. The main stress of the argument of the appellants on this point is laid on the want of notice to them of the executory proceedings, and the haste with which the proceedings were conducted. We have already shown that they were not entitled to notice, and the haste in the proceedings is accounted for by the fact that unless a sale were made in the early spring, the purchaser could not make a crop for that year; and, hence, the property would command a greater price at an early sale than at a later one. The evidence shows that everything was done in good faith and with all due publicity. The charge that Kennedy induced parties not to appear and bid at the sale is not substantiated by satisfactory proof; on the contrary, we think it is disproved. None of the parties interested seem to have thought the proceedings assailable either for fraud or any other cause. The sale was made March 7, 1874; Kennedy took immediate possession, and carried on the plantation. The complainant bank had suspended October 4, 1873, and went into bankruptcy. A receiver (Cockrem) was appointed October 20, 1873, and another receiver (Casey) July 1, 1874. The

latter, in his report to the comptroller, classed the claim against Williams as worthless.   He, or his predecessor, must have examined into the condition of the security at the time, and must have ascertained all about the sale to Kennedy, if they were not aware of it when it took place.   The receiver paid no further attention to the claim until shortly before the filing of the bill in this case, which was May 15, 1882, more than eight years after the sale took place.   The notes given to the complainants had then been due over five years, and no interest or principal had ever been paid on them.   Surely such an important asset of the bank, the principal of which was over $50,000, could not have been overlooked.   The other second mortgagees were equally oblivious to any illegality or fraud in the sale until this suit was brought.   It seems incredible that parties so deeply interested, represented as they were by vigilant and able counsel, did not in all this period discover the alleged illegalities and frauds.   The proceedings incident to the sale were matter of record; the petition for executory process, the order, the acknowledgment of the debt, the appraisement of the property, the purchaser's bid, the sheriff's deed, all lay open to inspection; and no sign was ever made for more than eight years by any of these parties.   They must have been satisfied with the regularity of the proceedings, and the good faith of Kennedy & Co. and Williams.   Their conduct is inexplicable on any other hypothesis.

As to any irregularities in the sale, the statute of limitations of 1855, now to be found in §§ 2809 and 3392 of the Revised Statutes, and article 3543 of the Civil Code, clearly applies. This statute declares that "all informalities connected with or growing out of any public sale, made by any person authorized to sell at public auction, shall be prescribed against by those claiming under such sale, after the lapse of five years from the time of making it, whether against minors, married women, or interdicted persons."

But it is alleged that the defendants, Kennedy & Co., were trustees for the complainants and the other mortgage creditors; and, therefore, that they are answerable for all profits and gains realized by Mr. Kennedy from the plantation purchased

by him. We are of opinion, however, that the relation of trustees did not arise from the agreement. Kennedy & Co. were to receive the crops and dispose of them, and if any surplus remained after reimbursing themselves for their advances and proper charges, they were to pay it over to the other mortgagees, instead of paying it to Williams. They only occupied the position of factors, legally responsible for any surplus in their hands. For this surplus, if they neglected to pay it over, they were liable in an action at law. This is a very different position from that of a trustee in the chancery sense of that term. The fact is, they never had any surplus and were never liable in any amount to the complainants, or their comortgagees.

But if we were not satisfied that the complainants have no case on the merits, we should still regard the great lapse of time which intervened between the transaction complained of and the filing of the bill for relief as a very serious obstacle to a decree in their favor. Eight years passed away before any complaint was made. The principal of the notes did not mature till April, 1877, it is true; but the interest became annually due, and none was ever paid. The ground of relief, if any existed, commenced to exist on the day of sale; and if the complainants, or the assignees, did not know of it at once, they must have known of it within a short period thereafter. There is nothing alleged as a ground of disturbing the sale, which they did not know, or which they were not put upon inquiry to ascertain within a year from the sale at most.

On the whole we are satisfied that the decree of the Circuit Court was right, and it is therefore

*Affirmed.*